UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| RITA K. FENWICK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:13-CV-1090-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| HARTFORD LIFE & ACCIDENT | ) | **ORDER** |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon cross motions for summary judgment. [R. 104; R. 107]  This case revolves around Defendant Hartford Life & Accident Insurance Company's ("Hartford Life") decision to cease providing Plaintiff Rita K. Fenwick ("Fenwick") with disability benefits under a plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  Hartford Life had previously provided Fenwick with Long Term Disability ("LTD") benefits.  However, Hartford Life later decided that Fenwick's disability did not preclude her from "Any Occupation" under the terms of the applicable insurance plan and ceased providing LTD benefits.  For the reasons below, the Court will hold that Hartford Life's termination of benefits decision was proper, will **DENY** Fenwick's Motion for Summary Judgment and will **GRANT** Hartford Life's Motion for Summary Judgment on all claims.

## I.    Statement of Undisputed Facts[1]

### A.    The Benefits Plan

Fenwick was an employee of Target Corporation ("Target") and worked as a "Store

---

[1] All facts in this memorandum opinion are derived from the Administrative Record ("AR"), [R. 104-2]. Citations to the administrative record are in the form of: [AR (page number as marked on the bottom right hand corner of the page) ].

Leader." [R. 104-1 p. 5]  Hartford Life issued Group Insurance Policy GLT-395265 ("the Policy") to Target. [AR 315–37]  This Plan insured the LTD component of Target's employee welfare benefit plan ("the Plan"), covering participants who were already receiving benefits under Target's previous self-insured plan. [AR 315–37]  As part of her employment, Ms. Fenwick was insured under the LTD policy—providing a monthly benefit in the event she became, and remained, "Disabled" through age sixty-seven. [R. 104-1 p. 2]

Target vested Hartford Life with "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy." [AR 325] The Plan defined "Disability" and "Disabled" to mean "during the first 24 months, You are prevented from performing Any Occupation and after 24 months Your inability to engage in Any Occupation which will provide an income equal or greater than 128% of the Monthly Benefit." [AR 325]  "Any Occupation" is defined as "any occupation for which You are qualified, or may reasonably become qualified, by education, training or experience." [AR 325]  Fenwick was responsible for submitting proof of continued disability under the Policy, which states:

> Benefit payments will stop on the earliest of:
> 1) the date You are no longer Disabled;
> 2) the date You fail to furnish Proof of Loss;
> . . .
> 12) If after 24 months of benefit payments You are qualified to perform a job that will provide an income equal to or greater than 128% of Your Monthly Benefit . . . .

[AR 321, 322]

## B.     Timeline of Events

### 1.     Fenwick is Initially Awarded LTD.

In August 2005, Plaintiff submitted a claim for LTD benefits to Principal Life Insurance Company ("Principal"), who administered Target's self-insured welfare benefit plan

at that time. [AR 372]  Principal initially denied the claim on October 20, 2005 [AR 455–57],

and Plaintiff appealed. [AR 448–52]  On appeal, Principal obtained a January 25, 2006

Functional Capacity Evaluation ("FCE"), which determined that Plaintiff could perform

full-time sedentary work, but noted that self-limitations exceeded normal limits and

"psychosocial and/or motivational factors [were] affecting test results." [AR 241–42]  Due to

the questions about the validity of the FCE, Principal obtained a March 14, 2006 Independent

Medical Evaluation ("IME"), which concluded Plaintiff could perform full-time sedentary

level work. [AR 688–93]  As that capacity would prevent her from performing her own job or

any comparable work, Principal reversed its decision and began paying "own occupation"

benefits, effective August 25, 2005. [AR 475–77]

By letter dated July 12, 2007, Principal informed Fenwick that it was approving

benefits beyond August 24, 2007, "on a provisional basis only" and that its test-change review

was ongoing to determine whether she would continue to meet the "Any Occupation"

definition of disability after that date. [AR 424–25]  Principal planned to complete an

Employability Assessment, obtain an update as to her Social Security claim and return to work

status, and a list of any new physicians. [AR 429]  The Employability Assessment, dated

December 3, 2007, concluded that there were four alternative occupations Fenwick could

perform. [AR 256]  Principal continued to follow up on her Social Security appeal and was

informed in August 2008 that Fenwick had been denied at the hearing level "as they

determined she could perform sedentary jobs that would allow her to move about." [AR 344]

Principal also notified her that its review had found other occupations she could perform as

well. [AR 344]  In an August 25, 2008 file memo, Principal's vocational specialist confirmed

that Fenwick could perform four positions that met the 128% earnings requirement. [AR 417]

Fenwick's claim transferred to Hartford Life on April 1, 2009. [AR 298, 886]

2.    **Hartford Life's Initial Review of Fenwick's claim Found Her Capable of Sedentary and Light Work and Terminated Her Claim.**

When Hartford Life took over the claim administration in April 2009, actual review of Fenwick's claim did not begin until December 2009. [AR 925]  Hartford Life obtained a December 22, 2009 Attending Physician Statement ("APS") from Fenwick's family doctor, Dr. Anna Fisher, who diagnosed Fenwick with low back and neck pain and opined that she was "unable to do sustained work." [AR 229–30]  In response, Hartford Life planned to obtain updated medical records to determine if the restrictions and limitations provided were supported. [AR 923]

In February 2010, Hartford Life received Dr. Fisher's office visit notes since September 2, 2009. [AR 919, 665–66]  The October 1, 2009 note indicated that Fenwick was sleeping better and that Lyrica was effective for pain but caused swelling. [AR 665]  Hartford Life followed up with a letter dated February 19, 2010, seeking specific sit, stand, and walk limitations, but Dr. Fisher responded that she would not complete them. [AR 661, 918]  She stated instead that Fenwick was "unable to do sustained work" and offered to refer Fenwick for an FCE if Hartford Life would pay for it. [AR 919]  Hartford Life's claims examiner referred the claim internally to Medical Case Management ("MCM") to determine whether Dr. Fisher's opinion was supported, make further attempts to obtain a more detailed opinion from Dr. Fisher, and determine if an FCE or other independent review was needed. [AR 918–19]

The MCM nurse reviewed the medical records in the file and concluded that they supported the existence of a back and neck condition that would prevent her from lifting greater than 20 pounds, but they did not contain a complete set of restrictions or support the

inability to sustain activity. [AR 917]  In a March 18, 2010 letter to Dr. Fisher, the MCM nurse acknowledged Dr. Fisher's offer to refer Fenwick for an FCE but explained that Fenwick had already undergone an FCE in the past, which reported self-limiting behavior that "does not make for valid testing of function." [AR 656]  The letter also set out the MCM nurse's conclusion that there was nothing in the medical records supporting Fenwick being precluded from at least sedentary work as long as she was able to take brief change of position breaks when needed.  [AR 656] The letter asked Dr. Fisher to provide medical information supporting her assessment if she disagreed. [AR 656–57]  Dr. Fisher's office responded that she would not complete the forms and that formal testing needed to be done. [AR 915]

The MCM nurse noted in the file that, because of the self-limiting behaviors in the previous FCE, another FCE was "not a desirable option," and referred the claim to an outside vendor for an IME instead. [AR 915]  Dr. Gregory Fisher, MD, a fellow in the American Academies of Orthopedic Surgeons and Disability Evaluating Physicians, reviewed the medical records; personally examined Fenwick on April 26, 2010; and provided a report and accompanying physical capacity evaluation ("PCE"). [AR 186–87, 673–78]  The report summarized the records, the physical exam, and Fenwick's self-reported subjective symptoms, and concluded that Fenwick was "able to perform light duty activities of lifting and carrying 10 pounds frequently and occasionally 20 pounds." [AR 673–78]  The reviewer's PCE similarly stated that Fenwick could sit 4-6 hours at a time, stand 1-2 hours at a time, and walk 1-2 hours at a time, for up to 8 hours per day. [AR 186]  He also noted that she could never crouch or crawl; could occasionally climb, balance, stoop, or kneel; could frequently drive and reach at all levels; and could constantly handle, finger and feel, but that she should avoid repetitive, excessive bending and twisting at waist level. [AR 186–87]  The MCM nurse

agreed that these restrictions and limitations were consistent and supported by the medical records. [AR 913]  The report was sent to Fenwick's family doctor for comment, but she did not respond. [AR 913]

On June 10, 2010, Hartford Life's claims examiner referred the case for an Employability Analysis Report ("EAR"). [AR 912–13]  The EAR, dated June 14, 2010, used the IME report's restrictions and limitations and identified three occupations that were within Fenwick's functional capabilities, skills, and education: Area Supervisor, Retail Chain, which was a previous occupation Fenwick had held; and two other similar managerial positions, Office Manager and Supervisor, Advertising-Material, which were both within the good-transferability match level. [AR 210–11, 216]  Based on the EAR finding other occupations Fenwick could perform (as Principal's EAR had found before), the claims examiner recommended termination of Fenwick's claim. [AR 908–10]  A manager reviewed the file and noted that the EAR had used an erroneously high earnings potential amount but because all of the occupations met the correct earnings amount, concluded that no changes were necessary and approved the termination. [AR 910]  By letter dated June 22, 2010, Hartford Life informed Fenwick that her benefits were terminated, effective June 21, 2010. [AR 1003–06] The letter set out the relevant Policy provisions, summarized the results of the IME and the EAR, stated the correct earnings potential amount, and concluded that, because Fenwick was not prevented from performing occupations for which she was qualified, benefits were no longer payable. [AR 1003–05]

### 3.     Hartford Life Reversed its Prior Claim Termination on Appeal.

Fenwick requested and received a copy of the claim file [AR 906–07], then appealed the termination, arguing that her condition had not changed and providing a July 26, 2010

PCE from her family doctor [AR 182–83, 385–86]  In the PCE, Fenwick's family physician again provided no specific sit/stand/walk limitations, stating only that Fenwick was "unable to sit for long periods." [AR 182]  She added that Fenwick could only occasionally drive, kneel, reach, handle, finger, feel, or lift up to 20 pounds and could never do anything else. [AR 182–83]  Hartford Life noted the disagreement between Fenwick's family doctor, who opined that Fenwick was disabled, and the FCE and two IMEs, which all concluded she could perform at least sedentary level work. [AR 903–04]  Because of this discrepancy, Hartford Life referred the claim to an outside vendor for an independent medical records review. [AR 904]

The vendor provided a September 23, 2010 report from Dr. Steven M. Lobel, MD, a board-certified physician in Physical Medicine and Rehabilitation/Pain Medicine.  A September 29, 2010 addendum was also provided altering some of the restrictions and limitations based on a conversation with Fenwick's family doctor, Dr. Fisher, on September 27, 2010. [AR 644–49]  Dr. Lobel stated that there was no evidence of significant side effects from Fenwick's medication or of any significant change or worsening of symptoms since August 2005. [AR 646]  He agreed that Fenwick's subjective reports were consistent with clinical findings and acknowledged that her pain could worsen if she worked full-time, but he concluded that it would not preclude her from full time work with the restrictions and limitations he outlined. [AR 646–47]  Based on the report and addendum, those restrictions and limitations were that Fenwick could sit up to 45 minutes at a time, with a 15 minute break, for up to 6 hours per eight hour workday; could stand or walk for up to 20 minutes at a time for up to 2 hours of combined standing and walking time per eight hour workday; could lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; could push and pull up to 20 pounds frequently and up to 30 pounds occasionally; could reach at waist level

- 7 -

frequently and above shoulder level from a seated position or below waist level occasionally; could bend and twist occasionally; had no restrictions on handling, fingering, feeling, or grasping; and should never crawl, climb ladders or scaffolds, work at unprotected heights, squat, kneel, or stoop. [AR 646–47, 649]

Based on Dr. Lobel's report, the family physician's opinion, and the 2006 FCE and IME, Hartford Life concluded that full-time sedentary level work with periodic changes was more reasonable and consistent with the medical records, and referred the claim for an updated EAR based on the more limited restrictions and limitations. [AR 898–99]  The October 6, 2010 EAR addendum concluded that none of the previously identified occupations would meet the new restrictions from Dr. Lobel's peer review report. [AR 159]  As a result, Hartford Life reversed the earlier termination by letter dated October 11, 2010, noting that the reversal did not guarantee payment indefinitely and she would have to continue to satisfy the Policy provisions for eligibility. [AR 996]

### 4.   Hartford Life Updated the Evidence in its File and Terminated Fenwick's Claim.

After paying benefits for nearly a year, Hartford Life sought to update its file in September 2011. [AR 885–86]  Fenwick was still seeing Dr. Fisher every four months and also treating at a pain clinic with Dr. Amol Soin. [AR 885]  A September 26, 2011 APS from Dr. Fisher reported diagnoses of low back and neck pain with stable physical exam findings. [AR 130]  It did not provide sit/stand/walk limitations, but again merely repeated that Fenwick was "unable to sit for long periods" and "unable to do sustained work." [AR 131]

On October 18, 2011, Hartford Life received medical records from Fenwick's pain management physician, Dr. Amol Soin, dated between January 5, 2011 and August 18, 2011. [AR 99–123]  Dr. Soin reported trigger points around the cervical muscles, pain to palpation

in the lumbar spine and radiculopathic symptoms. [AR 101]  In March 2011, he provided trigger point injections, resulting in follow-up visits in April and May 2011 reporting that Fenwick was "much improved" with "noted improvement in pain and functional scores." [AR 113, 117]  Dr. Soin also put Fenwick back on Lyrica. [AR 118]  Hartford Life received records from Dr. Fisher a few months later.  In a May 2011 visit with Dr. Fisher, Fenwick recounted her experiences with Dr. Soin, including that she had had trigger point injections in March and that "it helped." [AR 1486]  In January 2012, Hartford Life sought an APS from Dr. Soin, but, when his office stated that he would only complete the form for a fee and would not complete the functional capabilities section, Hartford Life declined. [AR 880]

Hartford Life decided in February 2012 that additional information about Fenwick's activities would assist the review, and referred the claim to the Claim Investigation Unit ("CIU") for handling. [AR 879]  CIU sought updated medical records and surveillance, and scheduled an in-person interview with Plaintiff. [AR 877]

In March 2012, an outside vendor provided surveillance video of Fenwick from February 27 and 28, 2012. [AR 1447–60]  On the first day, Fenwick was observed for only a few minutes, but, on February 28, Fenwick was observed driving on an errand in the mid-morning that lasted about an hour. [AR 1447]  Later that day, she drove to Target to go shopping. [AR 1447]  While at Target, Fenwick was observed over more than 45 minutes pushing a cart, bending at the waist, squatting down to look at items, and lifting and carrying items with both hands. [AR 1453–55]  Hartford Life interviewed Fenwick in person on April 9, 2012, at which time she provided the names of additional treating physicians, including one for a newly reported condition in her jaw (Eagle Syndrome) and another for her neck pain. [AR 1410–13, 1417–19]  Fenwick reported being able to walk or stand about 15–20 minutes

at a time, lift and carry a gallon of milk, bend forward to touch her knees (though not constantly), twist at the waist and neck with some limited range of motion, squat but not constantly, reach at all levels, and drive 30–45 minutes at a time. [AR 1425–37]

Hartford Life then obtained records from the new physicians and updated its file regarding the previous physicians.  Office visit notes from November 2011 to March 2012 were received from Dr. Daniel Akin (an ear, nose, and throat ("ENT") physician), who diagnosed her with Eagle's Syndrome (elongated styloid processes behind the jaw) and recommended surgery. [AR 1325–47]  Updated records from Dr. Fisher in November 2011 and March 2012 noted that Fenwick should follow up with her referral physicians regarding her pain and Eagle Syndrome. [AR 1307, 1312]  A May 8, 2012 note from Dr. Mladen Djurasovic (on referral by Dr. Fisher) reported a normal physical exam with mild degenerative changes in the cervical spine and mild disc bulges at C3-4 and C4-5, which Dr. Djurasovic referred to as "equivocal." [AR 1301, 1322–23]  He ordered a May 9, 2012 EMG, resulting in a normal study and no evidence of radiculopathy. [AR 1296–97, 1323]

The CIU investigative specialist referred the claim to an MCM nurse to clarify Fenwick's restrictions and limitations based on the newly received evidence. [AR 866]  In July 2012, the MCM nurse reviewed the medical records and concluded that an update of functional capacity was needed because the overall findings did not support limitations on use of her right hand or the inability to sit/stand for reasonable periods of time. [AR 861–63]  By letters dated July 19, 2012, the MCM nurse provided the surveillance, interview, and statement of disability to Dr. Fisher and Dr. Djurasovic and requested a response regarding current functional abilities. [AR 863, 959–62]  Specifically, she requested whether Fenwick had the functionality to perform activity "40 hours per week, primarily seated in nature, with

occasional walking and standing," allowing for full use of the upper extremities with lifting and carrying limited to 0-10 pounds frequently and 20 pounds occasionally and affording the opportunity to change body position/postures as needed for comfort by walking, standing, or moving around. [AR 959, 961]

When Hartford Life followed up with Dr. Djurasovic's office, an administrator in the office's "Pre-authorizations & Patient Disability Claims" department responded with a letter dated August 9, 2012, that the office did not do "[workers' compensation] impairment ratings, functional capacity evaluations (FCE), or disability determination examinations" but would be "happy to refer [Plaintiff] to an independent physician for such service." [AR 1279]  In response, Hartford Life decided to fill in the gap it had intended to complete with Dr. Djurasovic's orthopedic opinion by ordering an orthopedic IME. [AR 859]  After the IME had been set up, though, both treating physicians responded to Hartford Life's July 19, 2012 letters. [AR 855–58]  First, Dr. Fisher responded on August 13, 2012, stating that she agreed that Fenwick could perform as stated in the July 19, 2012 letter. [AR 1273–74]  She also recommended a formal FCE "to assist in this determination." [AR 1273]  A week later, on August 20, 2012, Dr. Djurasovic responded that he too agreed that Fenwick could perform as stated in the July 19, 2012 letter. [AR 1270–71]  Because both treating physicians agreed on Fenwick's restrictions and limitations, including the orthopedic surgeon (whose initial refusal to respond resulted in ordering the IME in the first place), the MCM nurse recommended canceling the IME and returned the claim to the investigative specialist for a decision using the restrictions and limitations agreed to by Fenwick's treating physicians. [AR 854]

The investigative specialist referred the claim for an updated EAR. [AR 853–54]  This September 6, 2012 EAR used the restrictions and limitations agreed to by Drs. Fisher and

Djurasovic and identified three occupations within Fenwick's functional capabilities, skills, and education: Word Processing Supervisor, Office Manager, and Personnel Clerks Supervisor, which were all within the closest- or good-transferability match levels. [AR 1251–55]  When the EAR was received, the investigative specialist noticed the low earnings potential amount was erroneously low and sought an addendum using the correct amount. [AR 852]  The September 13, 2012 addendum found that the position of Office Manager met the correct earnings requirements and, after an in-depth review of the occupation, concluded that Fenwick had demonstrated work traits that were are "the same or similar requirements of this occupation," which was "closely associated with her previous job as a Retail Chain Store Area Supervisor." [AR 1249–50]  The addendum also noted that the occupation was sedentary and would allow for positional adjustments. [AR 851, 1250]

After receiving the EAR, the investigative specialist noticed that the MCM nurse had not sent information to Dr. Turner believing he was a new local primary care physician but that Dr. Turner was actually Fenwick's family doctor in 2005, who had signed the original APS on Principal's claim form. [AR 819, 850]  The MCM nurse therefore forwarded the information to Dr. Turner, who informed Hartford Life that he had not seen Fenwick in some time and could not speak to her function. [AR 848–49]  The MCM nurse did not change her assessment based on this response and returned the claim to the investigative specialist. [AR 848]  By letter dated October 31, 2012, Hartford Life terminated Fenwick's claim. [AR 945–49]  The letter set out the relevant Policy provisions; summarized the surveillance, the MCM nurse's medical opinion, and the treating physicians' agreement with it; and concluded that, because Fenwick was not prevented from performing an occupation that met the earnings requirement, benefits were no longer payable, effective November 1, 2012. [AR 945–48]

- 12 -

### 5.       Fenwick Appeals Hartford Life's LTD Determination.

Fenwick submitted an appeal, asserting that Hartford Life had not been provided all of her medical records because she had not signed the appropriate release with her urgent care clinic. [AR 843–44, 1217–44, 1248]  In response, Hartford Life sought and received updated medical records from Dr. Fisher and the four providers identified in her letter: Dr. Akin, Dr. Terri Riddiford, Hometown Urgent Care, and Huber Health Center (Kettering Health Network). [AR 838–39]

Dr. Akin's records indicated that Fenwick had agreed to have the Eagle's Syndrome surgery, which occurred on August 16, 2012. [AR 1084–85, 1098]  At the first follow-up visit on August 20, 2012, Fenwick reported that she was doing well, denying pain. [AR 1080]  At an October 12, 2012 follow-up visit, Fenwick complained of pain only on the right side, where Dr. Akin's exam revealed a viral ulcer. [AR 1077–79]  Dr. Riddiford's notes showed that she saw Fenwick for back pain in July and November 2012 and provided steroid injections and prescriptions for Vicodin and Lidoderm. [AR 1100–14]  The Hometown Urgent Care notes described visits in December 2011 and February 2012, in which Fenwick complained of pain and received steroid injections. [AR 116–19]  The Kettering Health records detailed a single hospital visit on November 4, 2012, at which Fenwick complained of back pain that felt "different than normal." [AR 1133]  An x-ray of the lumbar spine was negative, and Fenwick was prescribed Percocet, advised to follow up with her family doctor, and discharged. [AR 1132, 1136]  The updated records from Dr. Fisher included office visit notes from May, July, October, and December 2012, in which Fenwick reported that her jaw was better post-surgery but continued to complain of lumbar pain for which she was

prescribed medication. [AR 1125–28]

After updating the file, Hartford Life referred the claim to an outside vendor for a co morbid Independent Medical Records Review. [AR 835]  The vendor provided a February 28, 2013 report from Dr. Jerome Siegel, MD, a board-certified physician in Internal Medicine and Occupational Medicine, and Dr. James Boscardin, MD, a board-certified physician in Orthopedic Surgery. [AR 1059–73]  Both reviewers were able to speak with Dr. Fisher and Dr. Riddiford, and Dr. Siegel was able to talk to Dr. Akin as well. [AR 1060, 1071]  Dr. Akin noted the successful surgery and his belief that he was not seeing Fenwick for any impairing conditions. [AR 1063]  Dr. Fisher told Dr. Siegel in a February 1, 2013 call that Fenwick "should be able to perform at least sedentary to light physical demand work activities with alternating between sitting and standing." [AR 1064]  Dr. Fisher was more protective of her patient in a subsequent call with Dr. Boscardin and declined to comment on functionality without an FCE. [AR 1071]  Dr. Riddiford also declined to provide specific functional capacities without an FCE, but could not articulate any specific reason Fenwick could not return to sedentary work and, after hearing of the observational materials, stated that sedentary work was "quite possible." [AR 1064, 1071]

Both reviewers determined that, based on the lack of objective findings in the EMGs, MRIs, and physical exams, along with the surveillance video and the earlier IMEs and FCE, Fenwick was capable of at least sedentary level work.  Specifically, Dr. Siegel opined that Fenwick could perform sedentary to light work; could, with frequent positional changes, sit for 30 minutes at a time for up to 4 hours in an 8-hour day, stand for 30 minutes at a time for up to 4 hours in an 8-hour day, and walk for 30 minutes at a time for up to 2 hours in an 8-hour day; could lift and carry up to 20 pounds occasionally and 10 pounds frequently; and

could bend, twist, squat, stoop, crouch, kneel, and reach overhead occasionally. [AR 1065–66]

Dr. Boscardin opined that Fenwick could function at least at a sedentary level; could sit for an

hour at a time with position changes, stand for 30 minutes at a time, and walk for 30 minutes

at a time, all for 4 hours each in an 8-hour day; and could grasp, key, or finger without

limitation. [AR 1072–73]  Neither reviewer found any additional limitations warranted by her

medication. [AR 1066, 1073]

By letter dated March 1, 2013, Hartford Life upheld its earlier termination. [AR 929–

33]  The letter reiterated the evidence relied on in the initial determination, including the

treating physicians' agreement that she could perform sedentary work; summarized the peer

reviewers' conversations with her treating physicians and their subsequent conclusions; and

concluded that the October 31, 2012 determination that Fenwick could perform the Office

Manager occupation was correct and therefore benefits were not payable after November 1,

2012. [AR 929–33]

On November 5, 2013, Fenwick initiated this action for benefits under 29 U.S.C.

§ 1132(a)(1)(B). [R. 1]  Plaintiff's Complaint also asserted a breach of fiduciary duty claim

under 29 U.S.C. § 1132(a)(3) and a claim for disgorgement under 29 U.S.C. § 1132(a)(1)(B)

and (a)(3). [Id.]  However, the Court previously dismissed Plaintiff's claims for equitable

relief based on any alleged breach of fiduciary duty. [R. 41]  Although the opinion did not

expressly mention the disgorgement claim, it would necessarily have included equitable

disgorgement as sought under Plaintiff's § 1132(a)(3) fiduciary breach claim.[2]  As a result,

---

[2] To the extent it was not dismissed as sought under § 1132(a)(1)(B), this Court has consistently held that the "accumulated earnings" Plaintiff's counsel seeks in the disgorgement claim are simply "recovered through an award of prejudgment interest. *Basham v. Prudential Ins. Co. of Am.*, No. 3:15-CV-897-DJH-DW, 2016 WL 5844037, at *2 (W.D. Ky. Sept. 30, 2016); *Davis v. Hartford Life & Accident Ins. Co.*, No. 3:14-CV-00507-TBR, 2016 WL 1574151, at *4 (W.D. Ky. Apr. 19, 2016); *Gluc v. The Prudential Ins. Co. of Am.*, No. 3:14-CV-519-DJH-DW, 2015 WL 6394522, at *3 (W.D. Ky. Oct. 22, 2015).

only the claim for benefits under 29 U.S.C. § 1132(a)(1)(B) remains at issue.

## II.     Standard of Review

The parties dispute which standard of review the Court should apply in reviewing the benefits decision made in this case.  Plaintiff argues that *de novo* review is mandated, [R. 104 pp. 3–7], while Defendant argues that the "arbitrary and capricious" standard should be applied [R. 107-1 pp. 16–18].

### A.     Governing Law

In ERISA actions, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When the plan vests the administrator with discretion to interpret the plan . . . the court reviews the benefits denial under the [more deferential] 'arbitrary and capricious' standard." *Corey v. Sedgwick Claims Mgmt. Servs., Inc.*, 858 F.3d 1024, 1027 (6th Cir. 2017) (citing *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002)) (citation omitted).

The arbitrary and capricious standard is "the least demanding form of judicial review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quotation marks and citation omitted).  The arbitrary and capricious standard requires the Court to review the Plan provisions and the record evidence and determine if the administrator's decision was "rational." *Id.*  Although the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of

the plan's provisions, then the decision is neither arbitrary nor capricious. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000).  Yet the deferential standard of review does not mean the Court should "rubber stamp[ ]" the plan administrator's decision. *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 307–08 (6th Cir. 2010) (citation omitted). Instead, a decision reviewed according to the arbitrary and capricious standard must be upheld if it results from "a deliberate principled reasoning process" and is supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

###    B.    Analysis

In order for the less exacting "arbitrary and capricious" standard of review to apply, Hartford Life must prove that the Plan expressly vested discretionary authority in an administrator and the administrator must have actually exercised that discretion. *Shelby Cty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 365 (6th Cir. 2009) (noting that the administrator must actually exercise discretion and cannot delegate decision to others).  Here, Hartford Life has met its burden.

###    1.    The Plan Expressly Vested Discretionary Authority in Hartford Life.

Plaintiff argues that there is not a clear grant of discretionary authority in the Plan and that Hartford Life did not exercise any discretion. [R. 104 pp. 3, 5]  However, the Plan granted Hartford Life "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." [AR 325]  Notably, aside from the name of the policy, this language is identical to that which this Court previously found (and interestingly, which Plaintiff's counsel did not dispute) to be a clear grant of discretionary authority in *Davis v. Hartford*, 3:14-CV-507-CHB-LLK, [R. 139 p. 6] (where the plan gave

- 17 -

Hartford Life "full discretion and authority to determine eligibility for benefits and to construe

and interpret all terms and provisions of the Group Insurance Policy.")  Plaintiff argues that

the *Davis* decision is non final (which is no longer the case) and non-binding (true, though it is

persuasive), and "has different deposition testimony than what has [*sic*] produced in this

case." [R. 120 p. 12]  But Plaintiff does not point to any particular difference in that testimony

that lessens the persuasive value of *Davis*.

Plaintiff's arguments that the Plan's clear language does not mean what it says are

unavailing.  Plaintiff argues that

> There is nothing in this language referring to the interpretation of facts or determining
> whether an individual satisfies the definition of "Disabled."  Specifically, determining
> 'eligibility' is defined in the LTD Policy as determining who are 'Eligible Persons'—
> who is eligible to be covered under the LTD Policy.

[*Id.* (citing AR 320)]  Plaintiff argues that interpreting facts or medical records and

determining whether an individual satisfies the Plan's definition of "Disabled" is not included

within either of the tasks within Hartford Life's discretion (construing and interpreting the

Policy terms and determining eligibility for benefits). [R. 119 pp. 16–17; R. 120 p. 11]  There

are at least five reasons why Plaintiff's argument fails.

First, the part of the plan which Plaintiff cites does not define "determining eligibility"

at all, let alone as "determining who are eligible persons." [*Contra* AR 320]  The cited portion

of the Plan does contain a definition of "Eligible Persons." [AR 320]  But it does not define

"determining eligibility."  Indeed, the explicit language of the delegation irrefutably shows

that "determining eligibility" is not limited to determining who are "eligible persons" for

coverage, because it specifically states that Hartford Life has "full discretion and authority to

**determine eligibility for benefits** and to construe and interpret all terms and provisions of the

Policy." [AR 325 (emphasis added)]  What is more, the Plan states that Hartford Life may

require "Additional Proof of Loss" "[t]o assist **Us[3] in determining if You are Disabled** . . . . , " [AR 322 (emphasis added)], and that benefit payments will be made "When **We determine that You**: 1) a [*sic*] **continue to be Disabled**; and 2) [*sic*] **eligible to receive benefits** . . ." [AR 323 (emphasis added)]

　　　　Second, as Defendant points out, this language is nearly identical to the language used by the Supreme Court in *Bruch* to describe the delegation of authority which would change the standard of review in an ERISA case: "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard **unless** the benefit plan gives the administrator or fiduciary discretionary authority to **determine eligibility for benefits** or to **construe the terms of the plan**." *Bruch*, 489 U.S. at 115 (emphasis added). Thus, Plaintiff's proffered interpretation of the Plan language is absurd, given that it mirrors the *Bruch* language. *See Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996) ("[U]nder *Bruch*, application of the highly deferential arbitrary and capricious standard of review is appropriate only when the plan grants the administrator authority to determine eligibility for benefits or to construe the terms of the plan.").

　　　　Third, the Plan contains a requirement that "[a]ll proof [of loss] submitted must be satisfactory" to Hartford Life, [AR 322], and the Sixth Circuit has held that such a requirement grants an administrator discretion to determine eligibility for benefits, mandating application of the arbitrary and capricious standard. *Yeager*, 88 F.3d at 381 (finding discretion to determine eligibility for benefits was granted by Plan requirement that claimant must submit "satisfactory proof of Total Disability to us"); *see also*, *e.g.*, *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 567 (6th Cir. 2013) ("This Court has found 'satisfactory proof,' and

---

[3] The Plan defines "We, Our, or Us" to mean "the insurance company named on the face page of The Policy." [AR 327]  The insurance company named on the face page of the Policy is Hartford Life. [AR 318]

similar phrases, sufficiently clear to grant discretion to administrators and fiduciaries.").[4]

Fourth, the Sixth Circuit, as well as many other decisions of the Western District and other district courts in this Circuit, have all found language exactly the same as (or differing only in immaterial respects from) that at issue in this case and in *Davis* to grant discretion to Hartford Life, triggering the application of the arbitrary and capricious standard of review. *See, e.g., Osborne v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296 (6th Cir. 2006); *Evans v. Hartford*, No. 3:08-CV-550-H, 2009 WL 3754200 (W.D. Ky. Nov. 5, 2009);[5] *Cochran v. Hartford Life & Acc. Ins. Co.*, No. 09-CV-11752, 2010 WL 259047 (E.D. Mich. Jan. 20, 2010); *Holler v. Hartford Life & Acc. Ins. Co.*, 737 F. Supp. 2d 883 (S.D. Ohio 2010), *opinion clarified on denial of reconsideration* (Nov. 22, 2010); *Zenadocchio v. BAE Sys. Unfunded Welfare Ben. Plan*, 936 F. Supp. 2d 868 (S.D. Ohio 2013); *Fant v. Hartford Life & Acc. Ins. Co.*, No. 09-12468, 2010 WL 3324974, at *6 (E.D. Mich. Aug. 20, 2010).

Fifth, the cases Plaintiff cites to support her argument, *Anderson v. Great W. Life Assur. Co.*, 942 F.2d 392 (6th Cir. 1991); *Shy v. Navistar Int'l Corp.*, 701 F.3d 523 (6th Cir. 2012); *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258 (6th Cir. 2007); and *Life Ins. Co. of N. Am. v. Sorilla*, 2015 U.S. Dist. LEXIS 68453 (D. Ariz. May 27, 2015), do not support it. Plaintiff cites *Anderson* for its statement that "discretion is not an all-or nothing proposition." [R. 119 p. 16]  But *Anderson* (which predates the authorities just discussed by fifteen plus years) merely explained that a plan can give discretion to the administrator, "but it must do so

---

[4] Interestingly, *Frazier* was argued and briefed by Michael D. Grabhorn, who is also Plaintiff's counsel in this case.
[5] Plaintiff attempts to distinguish *Evans* by saying that the discretionary language in *Evans* "specifically stated '[w]hen making a benefit determination under the policy,'" but that there is no such language in the Plan in this case. [R. 11]  While true, that completely ignores the additional language this Plan *does* have, which makes clear that Hartford Life has discretion to determine "eligibility for benefits," if a person is "eligible to receive benefits" and to determine if Fenwick is "disabled." [AR 322, 323, 325]  Thus, there is no principled distinction to be drawn from *Evans* on that basis.

clearly," and "[i]t follows from this principle that the area within which discretion can be exercised or the amount of discretion exercised depends on the scope of the grant." *Anderson*, 942 F.2d at 395. Anderson said nothing about whether plan language such as that at issue here is a limited grant of discretion, nor (if so) to what that grant is limited.

Similarly, Plaintiff cites *Shy* for the proposition that "[a]ny discretionary authority must be for 'the specific decision at issue.'" [R. 119 p. 17] However, *Shy* involved vastly different plan language. In that case, the Sixth Circuit found that the decision of a plan administrator was due no deference because the plan stated that the administrator was "responsible for the administration of the Health Benefit Program . . . subject to review by the Health Benefit Program Committee and that "[s]ubject to such review," the administrator had the "power[ ], right[ ], and dut[y] . . . to construe and interpret the Health Benefit Program and . . . to decide all questions of eligibility under such programs." *Shy*, 701 F.3d at 529. Because this language not only did not state that the administrator's authority to construe and interpret the program was discretionary, but expressly said that its authority to do so was subject to review by another entity, the Sixth Circuit held that there was no clear and express grant of discretionary authority to construe and interpret the program. *Id.* at 529–30.

Plaintiff seemingly cites to *Conger* to imply that discretion "regarding only 'terms, conditions and provisions'" of policy documents excludes discretion to "interpret insureds' medical records." [R. 104 p. 6] Yet, as Defendant points out, *Conger* contains only dicta on this point, and even that dicta cuts in favor of Defendant rather than Plaintiff, since *Conger* distinguished the operative language in that case from cases involving "much more far-reaching discretion clauses" extremely similar to the one in this case. *Conger*, 474 F.3d at 264 n.2.

Similarly, Plaintiff quotes *Sorilla* as support for her argument that the Plan here did not provide discretion to the administrator.  But Defendant is correct to point out that *Sorilla*, if anything, actually shows that the Plan did provide discretion. [R. 118 pp. 3–4]  Applying Ninth Circuit law, *Sorilla* explained that:

> When a plan "unambiguously provide[s] discretion to the administrator" to interpret the terms of the plan and make final benefits determinations, however, the determination is reviewed for an abuse of discretion.  For a plan to unambiguously provide discretion, it normally must grant "responsibility to interpret the terms of the plan and to determine eligibility for benefits."

*Sorilla*, 2015 U.S. Dist. LEXIS 68453, at *7 (citation omitted) (emphasis added).  It then held that because the language of the plan at issue "merely grant[ed] [the administrator] the authority to determine eligibility for benefits and not to interpret the terms of the plan, it d[id] not unambiguously grant discretion." *Id.* at *7–*8.  But here, the Plan explicitly gives Hartford Life both "full discretion and authority to **determine eligibility for benefits** *and* to **construe and interpret all terms and provisions of the Policy**"—exactly what *Sorilla* said (in line with the other binding and persuasive authorities discussed above) unambiguously provides discretion such that the administrator's determination is reviewed  under a highly deferential standard. [AR 325 (emphasis added)]

### 2.    Hartford Life Exercised Its Discretion.

Hartford Life, as the administrator of the Plan, exercised the discretion provided under the clear terms of the Plan in determining Fenwick's disability claim.

Plaintiff argues that Hartford Life has failed to prove that it did so, because Hartford Life has no employees, and her claim was instead handled by employees of Hartford Fire. [R. 104 p. 7]  Since the Policy conferred discretion upon Hartford Life, and did not permit Hartford Life to delegate its discretion, Plaintiff argues, the fact that Hartford Fire employees

administered her claim shows that Hartford Life exercised no discretion in this case. [*Id.*]

However, courts have repeatedly rejected Plaintiff's argument. As Defendant points out, "[c]ourts have, for purposes of determining which entity was acting, consistently ignored the question of which entity formally employs agents and pays their salaries, beyond the fact that it raises the issue in the first place." [R. 121 p. 7] Instead, these courts have looked to other factors, which the Court will consider in turn.

The first factor that courts have looked to is the letterhead on the correspondence with the claimant. *See, e.g.*, *Shelby Cty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 366 (6th Cir. 2009); *Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 379 (4th Cir. 2018); *Davis*, 2019 WL 3781437 at *4. Defendant notes that this is "an important factor indicating [on behalf of] what entity the decision-maker was administering a claim." [R. 121 p. 7] For instance, in *Shelby Cty.*, the Sixth Circuit found it significant that a third-party administrator for the Plan issued the final denial letter to the claimant on its *own* letterhead (as opposed to the plan administrator's letterhead). *Shelby Cty.*, 581 F.3d at 366. The letter stated that "[w]e have conducted a final review of the Plan's denial of benefits," and that its "decision to deny benefits [was] based on a reasonable interpretation of the Plan," indicating that the third-party administrator (not the plan administrator) determined whether the individual was eligible to receive benefits. *Id.* The Sixth Circuit concluded that:

> The evidence in the record demonstrates that [the third-party administrator] made the decision to deny coverage, communicated that decision directly to counsel for the [claimant], and then merely "informed" [the plan administrator] of its decision. Given the substantial evidence in the record supporting the district court's finding, we conclude that the district court did not clearly err in finding that [the third-party administrator] rather than [the plan administrator] made the decision to deny [the] claim for benefits.

*Id.* at 367.

Here, by contrast, the record reveals that the individuals who were communicating with Fenwick and who were ultimately responsible for her claim under the Plan were representing the interests and decisions of Hartford Life, not Hartford Fire.  The correspondence in this case was sent from individuals who had "Hartford Life and Accident Insurance Co." listed just below their signatures. *See, e.g.*, [AR 927-28, 929–33, 945–49]  Plaintiff argues that this evidence should not be persuasive because "any third-party administrator" could insert the name of the plan administrator, skirting the statutory requirement. [R. 119 p. 16]  However, this is not a third-party administrator situation; rather, Hartford Life — which does not have formal employees itself — acts through its agents.  These agents, while formally "employed" by Hartford Fire, work solely for Hartford Life administering claims under policies issued by Hartford Life and do not act or hold themselves out as acting on behalf of Hartford Fire. *See also* [R. 108-1 at 40:7-10, 111:12-113:10-14, 115:20-24; R. 118-2 at ¶¶ 3-4, 9-10, 12]

As this Court previously noted in *Davis*, the Fourth Circuit in *Griffin* confronted the precise question in this case—whether Hartford Life or Hartford Fire exercised discretion.  In doing so, the Court also considered company identifiers on correspondence with the claimant. *Griffin*, 898 F.3d at 379.  The court noted that:

> All correspondence to Griffin was written on The Hartford stationery and was signed by a person on behalf of Hartford Life, giving his or her job title at Hartford Life.  Thus, the letter denying his claim was written on stationery headed with the logo "The Hartford" and signed by "Vanessa L. Balogh, Senior Ability Analyst, Hartford Life and Accident Insurance Co."  Similarly, his appeal was denied by a letter on the same stationery and signed by "Mariann Letson, Ability Analyst, Hartford Life and Accident Insurance Co."  And, there was virtually no variation from this in all the other correspondence that occurred between Griffin and Hartford Life.

*Id.*  The Fourth Circuit affirmed that "Hartford Life, not Hartford Fire, determined that [the

claimant] was no longer eligible for long-term disability benefits." *Id.* at 380.

In this case, the decision-makers communicated with Fenwick and her counsel expressly on behalf of Hartford Life, signing their names above "Hartford Life and Accident Insurance Company" on "The Hartford" letterhead displaying the same "stag" logo as the Plan document. *See, e.g.*, [AR 929–33, 945–49]  Plaintiff asserts that, to the contrary, the "stag" logo and "The Hartford" trademark on the letterhead confirm that the decision-makers work on behalf of Hartford Fire because the trademark and logo are the "property of Hartford Fire." [R. 119 p. 16] (quoting the legal notice on the corporate family's website).  However, this legal notice further states that the trademark and logo are also the property of "certain subsidiaries of The Hartford."  Indeed, this logo appears on the face page of Fenwick's policy. *See* [AR 318]  Thus, the trademark and logo do not call into question that Hartford Life—the entity named beneath the logo and trademark on Fenwick's policy—exercised discretion. Instead, the correspondence with Fenwick (including the logo and trademark) indicate that the employees were acting on behalf of Hartford Life.

Another factor that courts have looked to is whether "the entity with discretion acted exclusively through individuals, who were formally employed and paid by a corporate family member but who spent all of their time working on behalf of the entity with discretion." [R. 121 pp. 7–8]; *see, e.g.*, *Griffin*, 898 F.3d at 380; *Davis*, 2019 WL 3781437, at *4; *Owens v. Liberty Life Assurance Co. of Boston*, 184 F.Supp.3d 580, 586 (W.D. Ky. 2016)[6].  Here, Defendant explained that the individuals who act on Hartford Life's behalf are, for administrative reasons, paid by another corporate-family entity, Hartford Fire. *See* [R. 108-1 at 111:12-113:14; R. 118-2 at 2-3 (¶¶ 2–5)]  However, these individuals worked solely on

---

[6] Michael and Andrew Grabhorn were counsel in this case as well.

Hartford Life policies pursuant to Hartford Life's processes, procedures, and discipline and under the authority and control of Hartford's officers and directors. *See* [R. 108-1 at 32:4-13, 32:23-33:2, 40:7-10, 54:10-13, 111:12-113:14, 115:19-24, 120:9-12; R. 118-2 at 4 (¶¶ 9–10)]

Plaintiff questions Defendant's assertions because Hartford Life does not have any form of contract with the individuals involved in Fenwick's case. [R. 104 p. 6]  But Plaintiff cites no legal authority to support her argument that Hartford Life should have entered a separate, specific contract with Hartford Fire employees to provide authority to act on behalf of Hartford Life.  As Plaintiff notes, the "most critical element in determining whether an agency relationship exists" is the "right to control," *Beauchamp v. Fed. Home Loan Mortg. Corp.*, 658 F. App'x 202, 205 (6th Cir. 2016) — not the existence of a contract.  In similar contexts, courts have focused on evidence of control rather than requiring a specific contractual agreement between the decision-makers and the entity. *See, e.g.*, *Griffin*, 898 F.3d at 379–80; *Potts v. Hartford Life & Accident Ins. Co.*, 272 F.Supp.3d 690, 704–06 (W.D. Pa. 2017)) (finding, in identical circumstances, that claim reviewers worked for Hartford Life even though they were paid by Hartford Fire); *Zurndorfer v. Unum Life Ins. Co. of America*, 543 F.Supp.2d 242, 256–57 (S.D. N.Y. 2008) (finding that claim reviewers were authorized agents acting on behalf of Unum America even though they were officially employed and paid by its parent company).[7]  Numerous federal courts faced with similar factual circumstances

---

[7] Plaintiff's generalized attempt to distinguish these cases is unpersuasive.  Plaintiff states that these cases "contained either different evidence than this case or lacked a final decision—they either settled before final resolution or the plaintiff's discovery efforts were curtailed." [R. 120 p. 10]  First, Plaintiff's reference to "different evidence" is vague, and the Court does not detect a meaningful difference from the Fourth Circuit's analysis in *Griffin* on the specific issue of whether Hartford Life exercised its discretion.  Second, Plaintiff's argument regarding the lack of a final decision is unavailing because an opinion's "finality" has nothing to do with settlement or failed discovery attempts.  Likewise, Plaintiff attempts to distinguish this Court's previous opinion in *Davis* on the basis that it is non-final, non-binding, and has different deposition testimony than what has produced in this case. [R. 120 p. 10]  However, the Court finds *Davis* highly persuasive and declines to sift through the voluminous records in an attempt to identify these alleged differences in the deposition testimony.

have reached the same conclusion.  The Court finds no reason to diverge from these results.

Finally, courts have looked to "other indications of supervision and control of the decision-making employees." [R. 121 p. 8]; *see, e.g.*, *See Shelby Cty.*, 581 F.3d at 366–67 (discussing the plan administrator's lack of involvement with the third-party administrator's decision); *Owens*, 184 F. Supp. 3d at 586 (citing an affidavit describing how employees were acting under the control and supervision of the entity with discretion).  Here, Defendant has presented evidence of an agency relationship in the form of an affidavit confirming that the employees involved with Fenwick's claim were acting in that capacity. [R. 118-2]  One court in this jurisdiction has found such an affidavit persuasive. *Owens*, 184 F.Supp.3d at 585–86 (finding that claim reviewers worked for Liberty Life even though they were paid by Liberty Mutual).  Plaintiff's final counter is that Hartford Life did not exercise discretion because it deferred to "persons with no authority to make disability decisions." [R. 104 p. 7]  Specifically, Plaintiff takes issue with the Investigative Specialist deferring to Hartford Life clinical staff for medical issues and to Hartford vocational staff for vocational issues. [*Id.*]  This argument is unpersuasive.  For all the reasons discussed above, these staff were acting on Hartford's behalf. *Accord Solomon v. Med. Mut. of Ohio*, 411 F. App'x 788, No. 09–4152, 2011 WL 13907, at *3 (6th Cir. Jan. 4, 2011) (noting that an *outside* expert opining on a medical issue had not improperly made a benefit decision, which had still ultimately been made by the administrator even though it apparently deferred to the expert's medical opinion).

In sum, each of the factors to which courts typically look — the correspondence with the claimant; the relationship between the entities; and other indications of supervision and control — counsels in favor of a finding that Hartford Life exercised its discretion in making the benefits determination.  Having resolved the factual issue of "who actually made the

benefit determination," the Court finds that the deferential review should apply to the decision to deny Fenwick's benefits. *Shelby Cty.*, 581 F.3d at 365, 367.  Accordingly, under Sixth Circuit jurisprudence, the Court must defer to the administrator's underlying decision if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 657 (6th Cir. 2013) (quoting *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).  The court will therefore uphold Hartford Life's benefits determination if it is "rational in light of the [Plan's] provisions." *Judge*, 710 F.3d at 658 (citing *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)).

## III.    Discussion

Without "rubber stamping" the administrator's decision, the Court applies a deferential standard of review to the material undisputed facts of this case.  Therefore, the Court must uphold the administrator's decision if "it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health and Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).  The Court will address each of these in turn.

### A.    Hartford Life's Decision was Not Affected by an Apparent Structural Conflict.

At the onset, the Court addresses whether Hartford Life's process was affected by an apparent structural conflict. "In the ERISA context, a conflict may exist when a plan administrator is simultaneously responsible for evaluating a claim *and paying out* the benefits." *Jackson v. Blue Cross Blue Shield of Michigan Long Term Disability Program*, 761 F. App'x 539, 543 (6th Cir. 2019) (emphasis in original).  In these cases, the administrator's fiduciary interest in granting a valid claim may conflict with its financial one that results from a denial. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008).  The conflict may arise, as

here, "even when . . . the administrator is an insurance company and not the beneficiary's employer." *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009) (citing *Glenn*, 554 U.S. at 112–15 (2008)). "Such conflicts do not render the denial of benefits invalid per se, but the reviewing court must take the conflict into account when evaluating the administrator's decision." *Jackson*, 761 F. App'x at 543 (citing *Curry v. Eaton Corp.*, 400 F. App'x 51, 58 (6th Cir. 2010)). For the Court to give great weight to a conflict of interest, "there must be significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th. Cir. 2006).

The Court is satisfied that Hartford Life's apparent structural conflict did not adversely affect the outcome of an otherwise "deliberate, principled reasoning process." Hartford Life obtained independent medical reviews and examinations from third-party vendors throughout Fenwick's claim process. There is nothing in the administrative record to suggest to the Court that these independently hired physicians were incentivized to find Fenwick was not disabled. Hartford Life also conducts audits of its claims to ensure they are being decided correctly, and those audits are used as part of employee evaluations. [R. 108-1 32:9-13; 32:23-33:2; 54:10-13] None of these actions suggest that Hartford Life's decision was influenced by a desire to deny disability benefits. Quite the opposite — Hartford Life went to great time and expense to ensure that the opinions it did receive were cogent and based upon sound medical evidence.

### B.    Hartford Life's Decision was the Result of a "deliberate, principled reasoning process."

Next, Hartford Life's determination that Fenwick was able to perform the essential duties of "Any Occupation" was the result of a "deliberate, principled reasoning process." *Baker*, 929 F.2d at 1144. Despite not having the burden to prove disability, Hartford Life

went to great lengths to ensure that an accurate claims decision was made by contacting Fenwick's treating and consulting physicians numerous times throughout the claims process. Hartford's handling of Plaintiff's claim leading up to its final appeal decision—including the diligent solicitation of medical records and opinions from Plaintiff's own physicians; the completion of multiple in-person examinations, multiple medical records reviews, and multiple EARs; and compilation of thousands of pages in the Administrative Record—reflects a "deliberate, principled reasoning process." *Baker*, 929 F.2d at 1144.

Plaintiff presents three primary arguments against the reasonableness of Defendant's decision-making process. First, Plaintiff argues that "the failure to obtain in-person testing deprived Ms. Fenwick of a full and fair review." [R. 119 p. 21] Second, Plaintiff contends that her prescription regimen and its impact were ignored. [*Id.*] Third, Plaintiff claims that the EAR was flawed. [*Id.* at p. 22] For the reasons described below, the Court does not find Plaintiff's arguments persuasive.

### Challenge to the Failure to Obtain an In-Person Examination

Plaintiff's first argument regarding the "failure to procure an in-person examination (i.e. IME or FCE)" is not well-taken for the simple reason that Hartford Life did obtain an IME. In fact, this was the second IME Plaintiff had undergone: the first in 2006 and the second in 2010. [AR 186–87, 673–78] Still, Plaintiff claims that the failure to complete a third IME "calls into question the thoroughness of [the] claims decision." [R. 119 pp. 20–21] While it is true that a third IME was scheduled in 2012 and subsequently cancelled, this was because two of Fenwick's treating physicians—Dr. Fisher and Dr. Djurasovic—both agreed on Plaintiff's restrictions and limitations. While Plaintiff argues that the limitations to which Dr. Djurasovic agreed were too vague to support canceling the IME, particularly in light of his

prior response, the Court disagrees.  Both Djurasovic and Fisher indicated their agreement that Fenwick could work "40 hours per week, primarily seated in nature . . . [with] the opportunity to change body positions/postures as needed for comfort (by walking, standing, or moving about)." [AR 1270]  It is perfectly clear from this context that this means a forty-hour workweek.  And while it is true that these limitations do not specify the daily limitations for each activity, they stated generally that she could walk, stand, or move about *as needed for comfort*, and Hartford Life reasonably made the determination of how many hours per day Fenwick could sit, walk, and stand based on the other evidence in the record.

In short, nothing in the Plan or ERISA mandated the completion of a third examination.  Although the Sixth Circuit has cautioned that "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination," *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005), it does not hold that failure to obtain one is arbitrary and capricious.  And such is not the case here.  Hartford Life thoroughly considered Plaintiff's functional limitations and relied on the opinions of two treating physicians in finding a third IME unnecessary.

### Challenge to Consideration of Plaintiff's Prescription Regimen and its Impact

Plaintiff's second argument, which focuses on her prescription regimen and the impact of narcotics on her functional abilities, is also quickly disposed of.  None of the evidence Plaintiff cites indicates that any side effects she may have had from her medications were severe enough to cause functional impairment.  For example, Dr. Fisher opined that "everybody's sensorium is affected" by narcotics.  However, when pressed by Dr. Boscardin, Dr. Fisher "was not sure whether [Plaintiff] was specifically having any cognitive issues" and

"was unable to provide any specifics other than the general comment made above." [AR 1071]
Further, while Plaintiff's past medical history noted in Dr. Soin's records for March 23, 2011
does list "Problems with Medications" along with "Dizziness . . . Vision Problems . . . Blurry
vision . . . Diarrhea . . . [and] Nausea," not only was there no indication that any of these
symptoms were caused by the medications, but Fenwick specifically *denied* those symptoms
as of that March 23, 2011 visit date. [AR 1392—93]  And the portion of the administrative
record which Plaintiff cites as "confirm[ing] the side-effects associated with narcotics" is
merely a generic "Patient Information" sheet from Kroger for a prescription for Hydrocodone.
[AR 642]  In light of this, there was certainly nothing unreasonable about Hartford Life
relying on Boscardin's opinion that her use of prescription medications did not warrant any
additional restrictions or limitations.  Hartford Life fully considered Plaintiff's prescription
medications and properly concluded on the evidence that they did not warrant additional
restrictions and limitations.

### Challenges to the EAR

Plaintiff's final argument challenges the EAR as flawed in several ways.  First,
Plaintiff contends that she cannot perform the occupation of Office Manager because of her
physical limitations, and that the EAR failed to accurately reflect those limitations. [R. 119 p.
22]  She points out the September 2012 EAR contained no addendum to account for the
specific restrictions provided by Drs. Siegel and Boscardin in February 2013. [*Id.* at pp. 22–
23]  However, the lack of an addendum to the EAR does not render Hartford Life's decision
arbitrary and capricious.  The EAR used a functional capacity of sedentary limited by the need
for an opportunity to change body positions or postures as needed. [AR 1251–55]  The
restrictions contained within the September 2012 EAR were the same as the restrictions and

limitations agreed to by Fenwick's treating physicians (Dr. Fisher and Dr. Djurasovic) in August 2012 and, as noted above, were completely consistent with the restrictions agreed to by the peer reviewers, Dr. Siegel and Dr. Boscardin, in February 2013. [AR 1065-66; 1072-73; 1270; 1273]  Therefore, no additional addendum was necessary, and the EAR was based on a complete and accurate statement of Fenwick's restrictions and limitations at the time of Hartford Life's decision.

Plaintiff argues in her reply that the "September 2012 EAR relied on the overly vague and non-specific limitations identified in the in-house nurse's July 19 letter."   But even if the Court were to consider this argument, it is not persuasive because those limitations were agreed to by Plaintiff's treating physicians, and as explained above, they were not unreasonably vague, particularly in light of the consistent, narrower restrictions that Drs. Boscardin and Siegel identified after their reviews.  The second is that the EAR did not compare Plaintiff's prior job duties with the duties required of an office manager.  But as discussed below, the EAR did compare those duties, and Plaintiff cites to nothing to show that the comparison needed to be more in depth.

Relatedly, Plaintiff also argues for the first time in her reply that there was no indication the occupation identified would be able to accommodate Fenwick's need to walk, stand, or move about.  For support, she cites to *Neaton v. Hartford Life & Acc. Ins. Co.*, 517 F. App'x 475 (6th Cir. 2013) (table), in which the Sixth Circuit found that Hartford Life acted arbitrarily and capriciously when among other things, it "relied on the opinion of an in-house vocational expert who cited no evidence in claiming that [plaintiff's former employer] could accommodate [his] high rates of absenteeism" necessitated by his medical conditions. *Neaton*, 517 F. App'x at 487.  But here, the September 6, 2012 addendum to the EAR shows these

accommodations were considered:

> All of the selected occupations were carefully reviewed to ensure they would meet the claimant's functional capabilities. . . . Ms. Fenwick has demonstrated the following work traits: directing, controlling, or planning activities of others, influencing others, dealing with people, making judgments and decisions, and performing a variety of duties which are the same or similar requirements of these occupations. . . . [The identified occupation is] sedentary in strength and . . . will allow for adjustments . . . in positioning as noted above.

[AR 1251-52]; *compare Potts*, 272 F. Supp. 3d at 716-17 ("While the denial letter did not specifically state what the specific physical requirements were for each of the jobs, this is of little consequence because Plaintiff was only matched with jobs in the first place that Plaintiff could perform given her restrictions and limitations. . . Defendant's expert stated how he arrived at the occupations listed in the report, namely by inputting Plaintiff's restrictions and limitations and identifying jobs that Plaintiff could perform given those parameters."). Additionally, common sense would seem to show that at least some office managers are allowed to stand, walk, or move about as needed for comfort during the workday. Anecdotally, in the Court's experience, an increasingly large number of employees in office settings use standing desks which permit them to change positions at will.

Still, the Court might otherwise have been persuaded by this argument and found that there was insufficient evidence and explanation for the EAR's conclusion that the identified occupation would accommodate Plaintiff's limitations, given that the EAR does not cite any actual data on this point and in light of the Sixth Circuit's unpublished opinion in *Neaton*. However, this argument was raised for the first time in a reply, giving Hartford Life no opportunity to respond and depriving the Court of the benefit of briefing from both parties on this issue. The Sixth Circuit has explained that "[g]enerally, [it] has found that an issue raised for the first time in a reply to a response brief in the district court is waived." *Ryan v. Hazel*

*Park*, 279 F. App'x 335, 339 (6th Cir. 2008) (internal quotation marks and citation omitted); *accord Solomon*, 411 F. App'x at 791 (6th Cir. 2011) ("To the extent that Solomon attempts to argue that this language does not does qualify as a clear grant of discretion, we consider the argument forfeited because Solomon offered it for the first time in her reply brief.").  In light of Plaintiff's lack of diligence in raising this argument in her initial motion, she has waived it and the Court will not consider it.

Plaintiff next contends that she cannot perform the occupation of Office Manager because of the training required. [R. 119 p. 23]  "The SVP rating is a measure of the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Contreras v. United of Omaha Life Ins. Co.*, 250 F. Supp. 3d 338, 341–42 (N.D. Ill. 2017) (internal quotation marks and citation omitted).  The Office Manager occupation has an "SVP 7," which applies to occupations requiring training or experience of "over 2 years up to and including 4 years." [*Id.*]  Plaintiff argues that requiring her to train for this position for over two years without income is not reasonable. [*Id.*]  However, the SVP also includes prior training such as "[e]ssential experience in other jobs." *See Potts*, 272 F. Supp. 3d  at 717 (quoting the Dictionary of Occupational Titles).  Here, Plaintiff's work experience as noted in the original 2010 EAR includes the positions of a Store Team Leader at Target (for four and a half  years),  Logistics Executive Team Leader (for 5+ years),  and an Administrative Assistant (for  eight months). [AR 210]  Defendant notes that the Office Manager occupation is within the "Good" match level to Plaintiff's training and experience, which means that she would only need "some" training in tools and/or materials. [AR 1254–55]

Plaintiff claims without citation to authority that only her role as Store Leader is

relevant, and that in this position, she "was required to follow the company guidelines as they related to sales, profitability, wages, performance evaluations, etc" and was "not tasked with analyzing operational reports, evaluating office operations, managing contracts, modifying work procedures, etc. — all necessary to performing the occupation of office manager." [R. 104 at p. 16]  Yet even assuming Plaintiff is correct that only this experience is relevant, she has over four years of experience (the outside limit of the SVP) as Store Team Leader alone. Just because some duties between the roles of Store Team Leader and Office Manager may be different does not show that her experience is irrelevant, especially given that the job description for the Store Team Leader role shows that Fenwick's responsibilities included "execut[ing] the highest level of authority and leadership within the store," "[d]irect[ing] the merchandising, operation, and personnel functions of the store toward attaining maximum profit, sales, return on investment, productivity, market share, guest goodwill, and team member satisfaction," and "[u]s[ing] creativity and decision making to improve and customize company direction to meet individual store needs and increase profits." [AR 226]

Other courts considering variations on Plaintiff's argument (which disregards the effect of experience on training times indicated by an SVP) have rejected it.  *See, e.g.*, *Potts*, 272 F. Supp. 3d at 717–718; *Griffin v. Hartford Life & Accident Ins. Co.*, No. 6:16-CV-024, 2017 WL 384384, at *8 (W.D. Va. Jan. 25, 2017)[8] ("SVP includes 'Essential experience in other jobs.' []  Therefore, it is more than likely that Plaintiff has already received the requisite preparation from his previous employment . . .").  Here, too, the evidence shows that Fenwick could reasonably become qualified for the Office Manager position. [AR 851, 1250]

Plaintiff's second attack on the EAR goes to Hartford Life's reliance on the median

---

[8] The Grabhorns were plaintiff's counsel in both of these suits as well.

wage of an office manager.  She argues that the EAR did not explain how she would be able to make the median wage when she had never performed this occupation and had been out of the workforce for over seven years.  To support this argument, she cites two cases (*Contreras* and *Flaaen v. Principal Life Ins. Co.*, 2017 U.S. Dist. LEXIS 159142, 2017 WL 4286358) from other district courts in other circuits applying a *de novo* standard of review and concluding that the record did not support the conclusion that the plaintiff would earn the median wage. However, these cases are distinguishable.

The Plan nowhere limits the earnings requirement to wages Fenwick could make immediately; it requires only "Any Occupation which *will provide* an income equal or greater than 128% of the Monthly Benefit." [AR 325 (emphasis added)]  This language does not specify any timeframe within which this must occur and thus encompasses more than the amount a claimant might make immediately upon reentering the workforce.  Thus, *Contreras* (which contained Plan language requiring that the plaintiff receive at least 85% of her "Basic Monthly Earnings" within 12 months of her return to work and involved a plaintiff who had never worked in any job with an SVP rating as high as the identified occupation) is not applicable.  Indeed, *Contreras* noted that "[i]f the Policy imposed no time limit for [the plaintiff] to earn the required wage," the plan administrator might have prevailed. *Contreras*, 250 F. Supp. 3d at 343.

Similarly, *Flaaen* is not particularly persuasive.  *Flaaen* involved policy language defining a gainful occupation as one that "'results in; or can be expected to result in' a qualifying salary." *Flaaen v. Principal Life Ins. Co.*, 2017 U.S. Dist. LEXIS 159142, *18, 2017 WL 4286358.  It rejected the argument that, precedent should be applied which held that similar language "appear[ed] to contemplate that an employee's income would increase as he

or she gains experience." *Id.*  It did so for reasons based heavily on the standard of review it applied (which was *de novo*).  But here, the policy language Plaintiff has identified simply does not say anything about a timeframe within which she must earn a qualifying salary.

Hartford Life also argues, just as the defendant in *Flaaen* argued, that "the median income is a common metric for achieving a reasonable idea of what income an occupation will provide," citing the Bureau of Labor Statistics website (which uses median wages to allow people to compare the earnings among occupations). [R. 118 p. 24]  Plaintiff argues in her reply that the median wage data ignored her regional labor market and that *Flaaen* held that the median wage is an "arbitrary heuristic" since it does not relate to a person's specific experience or qualifications.  However, even if the Court were to consider the untimely argument as to the relevant labor market, Plaintiff does not cite to any language in the Plan or any authority that ERISA requires that her regional labor market be considered. Further, the Court is simply not persuaded that there is something inherently arbitrary about the use of median wage data as opposed to below-median wage data.  This is particularly true given that in *Flaaen*, there was specific evidence that defendant's vocational assessment included entry level jobs, while here, there is no such evidence and Plaintiff's education and experience made her a "good" match for the position of office manager according to the EAR.  The Court agrees that it was neither arbitrary nor capricious for Hartford Life to use the median wage here.

Relatedly, Plaintiff claims that the Sixth Circuit "has previously taken issue with the employability analysis reports in cases involving Hartford Life — including those involving the exact same LTD Policy at issue here." [R. 104 pp. 19-20 (emphasis removed)]  For this proposition, she cites to the unpublished case of *Williams v. Target Corp.*, 579 F. App'x 390

(6th Cir. 2014).  However, *Williams* involved completely different facts.  In *Williams*, the EAR found one job that would provide at least 128% of the plaintiff's LTD benefits: "Supervisor, Accounting Clerks."  The EAR's calculation of the median monthly wage for that job was problematic for several reasons.

First, as the court pointed out, the EAR said that median monthly wage was based on the "Oasys May 2009 median wage data," but as the court pointed out, there was "no further information on how the wage data [wa]s computed." *Williams*, 579 F. App'x at 391.  Second, the EAR cited "wage data from both the Census and the Occupational Employment Statistics survey ("OES Survey")," but it was "unclear if and how that data affect[ed] the 'Oasys May 2009 median wage data." *Id.*  Third, both the Census data and the OES Survey data analyzed the wages of a category of 106 occupational titles ("First-Line Supervisors/Managers of Office and Administrative Support") but neither set of data analyzed the average wage for the specific job at issue ("Supervisor, Accounting Clerks"). *Id.* at 392.  Fourth, the two data sets conflicted in that the Census data showed monthly median wages below the requisite 128% mark and the OES Survey data showed monthly median wages that could exceed it. *Id.*  The court further noted that while the district court and parties assumed the EAR's wage estimate was based on Department of Labor data, there was no clear evidence in the administrative record supporting that or otherwise explaining how OASYS computed the wage data. *Id.*  And even assuming Department of Labor data was used, the court could not tell whether OASYS looked at wage data for the broader occupational classification of 106 occupational titles, or if it considered wage data specific to the job of "Supervisor, Accounting Clerks." *Id.*

Here, by contrast, it is clear that the EAR used Department of Labor data, and it is clear what data the EAR examined.  Specifically, after adjusting to consider the proper 128%

range[9], the one position for which the EAR examined a monthly median wage was Manager, Office (apparently "cross-walked"[10] to the position of "Administrative Services Managers", *see* [R. 104 at p. 17 n. 6], which is a category containing just 6 occupational titles, [AR 1249, 1260]).  The EAR stated that the median monthly wage was "[b]ased on the 2010 National OES Wage Statistics." [AR 1249]  It is clear that the EAR used Department of Labor data because the previous version of the EAR (which was later amended) explicitly stated that it had been "[b]ased on the 2011[11] National OES Wage Statistics (**obtained from web site www.bls.gov**"). [AR 1252 (emphasis added)]  And as Defendant points out, there is clearly no confusion as to which data the EAR used, since Plaintiff herself clarified the source of the data vis a vis the "crosswalk" occupation. [*See* R. 104 p. 19 n. 6]

That leaves the Plaintiff to rely on the argument that the National OES Wage Statistics data is fatally flawed because the position category the EAR analyzed included multiple occupational titles.  But *Williams* did not state a hard-and-fast rule that a job category that includes multiple occupational titles is automatically too broad.  Rather, *Williams* noted that the data at issue in the case "appear[ed] to be rather broad" as the classification at issue included 106 job titles. *Williams*, 579 F. App'x at 392.  By contrast, here, the classification at issue includes just 6 job titles.  Given the highly dissimilar facts of this case from those in *Williams*, the Court declines to extend *Williams* to cover this case.

In sum, Plaintiff's objections to the EAR do not demonstrate Defendant's decision was

---

[9] While the parties disagree as to exactly how much this amount was, it makes no difference since the Office Manager median wages in the EAR exceeded this amount no matter who is right. [*See* R. 118 at p. 30; R. 104 at p. 18]

[10] "**Crosswalks** connect occupations in the O*NET database to other classification systems." O*Net Resource Center, (April 3, 2020), https://www.onetcenter.org/crosswalks.html (emphasis original).

[11] While it is true that no explanation is provided for the revised EAR using the 2010 statistics rather than the 2011 statistics, if anything, this operated in Plaintiff's favor, since the 2010 median monthly wage for the office manager job was less than the 2011 median monthly wage. *Compare* [AR 1249] *with* [AR 1252]

arbitrary and capricious.  Based on the available medical evidence, Defendant made a reasonable conclusion that Plaintiff could work in a sedentary occupation.  Hartford Life's process was the result of a "deliberate, principled reasoning process" that sought professional medical opinion testimony from Fenwick's treating and consulting physicians as well as independent medical examiners in addition to surveillance and clarifications on numerous occasions. *Baker*, 929 F.2d at 1144.  The Court finds no fault in the process employed.

> C.  **Hartford Life's Decision was "supported by substantial evidence."**

Hartford Life's decision was also supported by substantial evidence in the administrative record.  A plan administrator's determination is not arbitrary or capricious when a reasoned explanation, based on the evidence, supports that determination. *Whitaker v. Hartford Life & Accident Ins. Co.*, 121 F. App'x 86, 88 (6th Cir. 2005) (citing *Ky. Fin. Cos. Ret. Plan*, 887 F.2d at 693).  As noted above, even if there is evidence to support a finding of disability, a plan administrator's decision to deny benefits in light of the plan's provisions is not arbitrary or capricious as long as there is a reasonable explanation for that decision.  Thus, the Court does not consider Fenwick's arguments that the evidence supports a finding of disability. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000).

The Supreme Court and the Sixth Circuit have announced "certain guideposts" to follow when reviewing benefit determinations in the ERISA context. *Evans v. Unum Provident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006).  First, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Consequently, it is not arbitrary

and capricious for a plan administrator to accord more weight to one doctor's opinion over another when deciding if a claimant is entitled to ERISA benefits, since when an administrator does so it is "possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).

Next, the Sixth Circuit has held that there is "nothing inherently objectionable about a file review . . . in the context of a benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292–93 (6th Cir. 2006). This is true regardless of whether the file review is conducted by a physician or a nurse. *See Judge*, 710 F.3d at 663 (citing *Boone v. Liberty Life Assurance Co. of Boston*, 161 F. App'x 469, 474 (6th Cir. 2005)).

Here, the administrative record is replete with medical evidence on which Hartford Life based its decision to terminate Fenwick's LTD benefits. Hartford Life relied upon the reports and opinions of the following physicians and medical professionals: 1) Dr. Anna Fisher—Fenwick's family doctor; 2) Dr. Djurasovic—a referral from Dr. Anna Fisher; 3) Dr. Gregory Fisher, who conducted an IME; 4) Dr. Lobel, who completed a Peer Review Report; 5) the MCM nurses, who completed reviews of the record; and 6) Drs. Siegel and Boscardin, who conducted the Co-Morbid Peer Review Report. A brief discussion of the relevant opinions of each follows.

Dr. Anna Fisher stated that Fenwick should be able to perform at least sedentary physical demand work activities with alternating between sitting and standing. [AR 1064] Although she later became more protective of her patient, Dr. Fisher could not assert that Fenwick could perform less than sedentary level work. [AR 1071]

Dr. Djurasovic reported a normal physical exam with "equivocal" imaging, and the

subsequently ordered EMG was normal. [AR 1296–97, 1301, 1322–23]  Like Dr. Fisher, Dr.

Djurasovic agreed that Fenwick could perform at least sedentary physical demand work

activities with alternating between sitting and standing. [AR 1270–71]

Dr. Gregory Fisher performed an in-person examination of Plaintiff in April 2010 and,

based on that exam and his review of the medical records available at that time, concluded that

Plaintiff was "able to perform light duty activities of lifting and carrying 10 pounds frequently

and occasionally 20 pounds" [AR 673–78], and that Fenwick could sit 4-6 hours at a time,

stand 1-2 hours at a time, and walk 1-2 hours at a time, for up to 8 hours per day; frequently

drive and reach at all levels; and constantly handle, finger and feel. [AR 186–87]

Dr. Lobel found that there was no evidence of significant side effects from Fenwick's

medication or of any significant change or worsening of symptoms since August 2005 and

concluded that Plaintiff could perform full-time sedentary work with a few additional

restrictions. [AR 646–47]  At that time, Hartford Life found that those additional restrictions

allowed Fenwick to meet her burden to show disability. [AR 159–60]  Later medical opinions

agreed with Dr. Lobel's conclusion that Fenwick could perform sedentary level work.

The MCM nurse, after reviewing the entire record through March 18, 2010, opined

that there was nothing in the medical records supporting Fenwick being precluded from at

least sedentary work as long as she was able to take brief change of position breaks when

needed. [AR 656]

The CIU MCM nurse, after reviewing the entire record through July 19, 2012,

concluded that Fenwick had the functionality to perform activity "40 hours per week,

primarily seated in nature, with occasional walking and standing," allowing for full use of the

upper extremities and affording the opportunity to change body position/postures as needed

for comfort by walking, standing, or moving around. [AR 959, 961]

Although Plaintiff argues that these nurses do not meet the Policy definition of "Physician," [R. 119 p. 19], the portion of the Plan to which Plaintiff cites does not contain a requirement that a "Physician" conduct file reviews. [*Contra* AR 326]   Furthermore, "[f]or a full and fair review under ERISA, the regulations do not mandate . . . that the reviewer be a physician as opposed to some other medical professional." *See Thompson v. Hartford Life & Accident Ins. Co.*, No. 1:09-CV-164, 2011 WL 13209804, at *3 (W.D. Ky. Mar. 23, 2011)[12] (citing ERISA cases holding that nurse reviews supported a decision).  Defendant's reliance on the MCM nurses' opinions contributes to the substantiality of the evidence.

Drs. Siegel and Boscardin both reviewed the entire record and spoke with Plaintiff's treating physicians, then agreed that the evidence, including the surveillance, FCE and two IMEs finding sedentary function, and paucity of objective findings on exam, imaging, and electrodiagnostic studies, clearly established that Plaintiff could perform sedentary level work. [AR 1065, 1071–72]

Plaintiff argues that Dr. Siegel's and Dr. Boscardin's conclusions that she could only sit for four hours per day do not translate to the ability to perform full-time sedentary level work. [R. 119 p. 18]  As support, she cites *Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x 544, 548–49 (6th Cir. 2006), where the Sixth Circuit found "no evidence" that the claimant could perform "any . . . sedentary job," along with *Wilkins v. Comm'r of Soc. Sec.*, 2017 U.S. Dist. LEXIS 33039 and *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159 (9th Cir. 2016).  However, neither *Brooking* nor Plaintiff's other cited cases address the issue here: whether there are "sedentary" occupations that also allow a person to stand and change

---

[12] Michael Grabhorn was plaintiff's counsel in this case.

positions for comfort consistent with a limit of four hours of sitting time a day.

In *Brooking*, it was uncontested that the claimant could not "maintain a seated position for more than an hour at a time and that sitting provokes considerable pain." *Id.* at 549.  The uncontroverted evidence showed the plaintiff was unable to sit for longer than one hour at a time, to total no more than either one third or 4 hours out of a business day. *Id.* at 548.  In fact, the plaintiff's FCE said regarding her ability to complete "lowered work in sitting" that she could "never" do so because she "[c]ould not assume [the] position" due to her medical issues. *Id.*  The court noted that the jobs Hartford Life identified as possible for the plaintiff were classified as "sedentary," and that "[a]ccording to U.S. Department of Labor definitions, sedentary jobs require sitting for most of the day." *Id.*  The court noted that there was "no evidence that [plaintiff] could perform either of these jobs, or any other sedentary job." *Id.* at 548-49.  Thus, Hartford Life had failed to offer a reasoned explanation for terminating the plaintiff's benefits. *Id.* at 549.

In this context, the *Brooking* court did state that the jobs Hartford Life identified "on their face, require[d] more than four hours of sitting a day" by virtue of being sedentary. *Id.* But there was no discussion in *Brooking* of any evidence to the contrary (that is, of any evidence that the jobs at issue *could* accommodate the plaintiff's sitting restrictions).  Here, the EAR indicated that Hartford Life took Fenwick's restrictions into account and limited its inquiry into potential occupations to those which would accommodate the restrictions agreed to by Drs. Siegel and Boscardin, and the September 13, 2012 EAR specifically found that the identified occupation — though "sedentary" — would "allow for adjustments in positioning required of her restrictions." [AR 1250]  And as discussed above, Fenwick has waived any argument that the EAR insufficiently supported this conclusion, nor has she pointed to

anything in the record to affirmatively suggest that it is factually false.  In light of these distinctions, the Court declines to extend the holding of *Brooking* to these facts.

Similarly, in *Wilkins*, a social security case, the Eastern District of Michigan stated that "being able to sit for four hours per day is not consistent with *the [Social Security] Commissioner's* definition of sedentary work," which it identified as "*generally* associated with sitting for about six hours in an eight-hour workday." *Wilkins*, 2017 U.S. Dist. LEXIS 33039, *40 (emphasis added).  Since the Administrative Law Judge in *Wilkins* did not "address or reconcile this aspect of [a physician's] opinions," since all the medical opinions in the record were consistent with regard to the plaintiff's limitations on sitting, and since the Administrative Law Judge "did not rely on any medical opinions in concluding that plaintiff was able to perform *the full range* of sedentary work and was *not limited in any way* in her ability to sit," *id.* at *41 (emphasis added), the court found that remand was necessary so that the Administrative Law Judge could reconsider the medical opinions regarding plaintiff's ability to sit. *Id.* at *43.  Here, though, Hartford Life specifically noted Plaintiff's limitations on sitting, and the Court is not concerned with the Social Security Commissioner's definition of "sedentary."[13]  The issue is whether Hartford Life made "some inquiry into whether the

---

[13] The Court is not persuaded otherwise by the Plaintiff's reference to the Ninth Circuit case of *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159 (9th Cir. 2016).  That case, citing to many cases including *Brooking*, held that "an employee who cannot sit for more than four hours in an eight-hour workday cannot perform 'sedentary' work that requires 'sitting most of the time.'" *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016).  In *Armani*, the plaintiff was limited to sitting for four hours a day and to standing and walking for *two* hours a day (thus totaling less than a full workday).  In this case, Fenwick was limited to sitting for four hours a day and to standing and walking for *four* hours a day.  As noted, Hartford Life took Plaintiff's four-hour maximum sitting limitation into account when analyzing potential jobs.  Plaintiff has pointed to no evidence that Hartford Life was incorrect to say that the position of Office Manager would permit her to stand or walk as needed for comfort the other four hours of the workday.  Thus, there appears to be nothing to Plaintiff's argument that the position of Office Manager would *require* "sitting most of the time."

jo[b] selected [is] on[e] that the claimant can reasonably perform in light of specific disabilities." *Brooking*, 167 F. App'x at 549.  As already explained, it did.

Finally, Plaintiff argues that her condition deteriorated after she was initially approved for LTD benefits (and received them for more than seven years) and that this casts doubt on the administrator's decision under *McCollum v. Life Ins. Co. of N. Am.*, 495 F. App'x 694, 697 (6th Cir. 2012).  However, *McCollum* expressly stated that there is no "rule that when a plan administrator suddenly changes course, the administrator must have new evidence of improvement.  But in those circumstances, the plan administrator must have some reason for the change based on any number of factors." *Id.* at 704; *accord Quarles v. Hartford Life & Accident Ins. Co.*, No. 315CV00372CRSCHL, 2019 WL 1290891, at *9 (W.D. Ky. Mar. 20, 2019) *and Griffin*, 2017 WL 384384 at *5 ("The fact that Defendant denied benefits despite providing them for several years does not indicate that Defendant made an arbitrary decision.")  In this case, Hartford Life's reason is based on further investigation and review, including the surveillance, the MCM nurse's opinion, and the agreement of Plaintiff's two treating physicians that she was capable of sedentary work with the ability to change positions as needed.  In sum, Hartford Life's reliance on this pinpointed occupation — which comported with Fenwick's physical limitations — constitutes substantial evidence to support its decision.

Even though it is not incumbent upon Hartford Life to provide an explanation of why it credited some of Fenwick's treating and consulting physicians, *Nord*, 538 U.S. at 834, Hartford Life's explanation comports with the Court's read: the majority of medical opinion concluded that Fenwick could return to work with certain limitations.  It was reasonable for Hartford Life to credit these sources, the majority of whom found that Fenwick could perform sedentary level work with the ability to change position as needed.  The administrative record

contains more than enough relevant evidence that a "reasonable mind" would accept as sufficient to support Hartford Life's conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (citation omitted).  Even if there is some conflicting evidence, the existence of other arguably "reasonable" conclusions does not render Hartford Life's decision arbitrary and capricious. *See Hurse v. Hartford Life & Accident Ins. Co.*, 77 F. App'x 310, 318 (6th Cir. 2003) ("[T]he . . . finding does not need to be the only reasonable conclusion that the evidence could support, and may, in fact, be one of several inconsistent conclusions, so long as it is supported by enough relevant evidence to convince a reasonable mind.").  As such, Hartford Life's decision to uphold Fenwick's termination of benefits was based upon substantial evidence and was neither arbitrary nor capricious.

## IV.   Conclusion

Based on the above, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.   Plaintiff Rita K. Fenwick's Motion for Summary Judgment [**R. 104**] is **DENIED**.

2.   Defendant Hartford Life & Accident Insurance Company's Motion for Summary Judgment [**R. 107**] is **GRANTED**.

3.   The Defendant's decision regarding Plaintiff Rita K. Fenwick's claim for long-term disability benefits will be **AFFIRMED** by separate judgment entered this date.

This the 4th day of May, 2020.

Claria Horn Boom

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc:   Counsel of record